UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DARLENE R. OWENS, | ) | CASE NO. 5:13CV212 |
| | ) | |
| Plaintiff, | ) | MAGISTRATE JUDGE GEORGE J. |
| | ) | LIMBERT |
| v. | ) | |
| | ) | |
| CAROLYN W. COLVIN[1], | ) | MEMORANDUM OPINION AND ORDER |
| ACTING COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

Darlene R. Owens ("Plaintiff") seeks judicial review of the final decision of Carolyn W.
Colvin ("Defendant"), Acting Commissioner of the Social Security Administration ("SSA"),
denying her applications for Disability Insurance Benefits ("DIB") and Supplemental Security
Income ("SSI").  ECF Dkt. #1. For the following reasons, the Commissioner's decision is affirmed
and Plaintiff's complaint is dismissed with prejudice:

## I.    **PROCEDURAL AND FACTUAL HISTORY**

On October 28, 2010 and November 2, 2010, Plaintiff  applied for SSI and DIB, alleging
disability beginning April 20, 2010.  ECF Dkt. #12 ("Tr.") at 189-199.[2] Plaintiff met the insured
status requirements of the Social Security Act through December 31, 2015 ("DLI").  Tr. at 20. The
SSA denied Plaintiff's applications initially and on reconsideration. Tr. at 136-141.  Plaintiff
requested an administrative hearing, which was held on June 6, 2012.  At the hearing, the ALJ
accepted the testimony of Plaintiff, who was represented by counsel, and Dr. Robert Mosley, a
vocational expert ("V.E.").  Tr. at 41-71. On July 3, 2012, the ALJ issued a Decision denying

---

[1]On February 14, 2013, Carolyn W. Colvin became the acting Commissioner of Social Security,
replacing Michael J. Astrue.

[2]References to the administrative record in this case refer to the ECF docket number of the cited
document and the page number assigned to cited pleading by the ECF system, which can be found in the
search box at the top of the page on the ECF toolbar.

benefits. Tr. at 19-34. Plaintiff filed a request for review, which the Appeals Council denied on January 17, 2013 Tr. at 1.

On January 29, 2013, Plaintiff filed the instant suit seeking review of the Decision.  ECF Dkt. #1.  On May 22, 2013, Plaintiff filed a brief on the merits.  ECF Dkt. #17. On June 19, 2013, Defendant filed a brief on the merits.  ECF Dkt. #18.  A reply brief was filed on July 3, 2013. ECF Dkt. #20.

## II.    SUMMARY OF RELEVANT PORTIONS OF THE ALJ'S DECISION

The ALJ determined that Plaintiff, who was fifty-one years of age on the alleged onset date and fifty-three years of age at the hearing, suffered from cervical and lumbar degenerative disc disease, and adjustment, depressive, and anxiety disorders with a history of alcohol abuse, which qualified as severe impairments under 20 C.F.R. §§ 404.1520(c) and 416.920(c). Tr. at 21.  The ALJ further determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, 20 C.F.R. §§404.1520(d), 404.1525, 404.1526, §416.920(d), 416.925 and 416.926 ("Listings").  Tr. at 22-23.

The ALJ found that Plaintiff had the residual functional capacity ("RFC") to perform light work as defined in 20 C.F.R. §404.1567(b) and 416.967(b), except that she must be permitted to alternate between sitting and standing positions at will, and she is limited to low stress work, defined as work performed at a non-production or low-quota pace.  Tr. at 23.

The ALJ ultimately concluded that, although Plaintiff could no longer perform her past work as a picker, there were jobs that existed in significant numbers in the national economy that Plaintiff can perform, including the representative occupations of inspector and assembler.  Tr. at 33. As a consequence, the ALJ found that Plaintiff had not been under a disability as defined in the SSA and was not entitled to benefits.

## III.    STEPS TO EVALUATE ENTITLEMENT TO SOCIAL SECURITY BENEFITS

An ALJ must proceed through the required sequential steps for evaluating entitlement to benefits.  These steps are:

1.   An individual who is working and engaging in substantial gainful activity will not be found to be "disabled" regardless of medical findings (20 C.F.R. §§ 404.1520(b) and 416.920(b) (1992));

2.   An individual who does not have a "severe impairment" will not be found to be "disabled" (20 C.F.R. §§ 404.1520(c) and 416.920(c) (1992));

3.   If an individual is not working and is suffering from a severe impairment which meets the duration requirement, see  20 C.F.R.  § 404.1509 and 416.909 (1992), and which meets or is equivalent to a listed impairment in 20 C.F.R. Pt. 404, Subpt. P, App. 1, a finding of disabled will be made without consideration of vocational factors (20 C.F.R. §§ 404.1520(d) and 416.920(d) (1992));

4.   If an individual is capable of performing the kind of work he or she has done in the past, a finding of "not disabled" must be made (20 C.F.R. §§ 404.1520(e) and 416.920(e) (1992));

5.   If an individual's impairment is so severe as to preclude the performance of the kind of work he or she has done in the past, other factors including age, education, past work experience and residual functional capacity must be considered to determine if other work can be performed (20 C.F.R. §§ 404.1520(f) and 416.920(f) (1992)).

*Hogg v. Sullivan*, 987 F.2d 328, 332 (6th Cir. 1992).  The claimant has the burden to go forward with the evidence in the first four steps and the Commissioner has the burden in the fifth step.  *Moon v. Sullivan*, 923 F.2d 1175, 1181 (6th Cir. 1990).

## IV.   STANDARD OF REVIEW

Under the Social Security Act, the ALJ weighs the evidence, resolves any conflicts, and makes a determination of disability.  This Court's review of such a determination is limited in scope by § 205 of the Act, which states that the "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Therefore, this Court's scope of review is limited to determining whether substantial evidence supports the findings of the Commissioner and whether the Commissioner applied the correct legal standards.  *Abbott v. Sullivan*, 905 F.2d 918, 922 (6th Cir. 1990).

The substantial-evidence standard requires the Court to affirm the Commissioner's findings if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Cole v. Astrue*, 661 F.3d 931, 937, citing *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation omitted).  An ALJ's failure to follow agency rules and regulations "denotes a lack of substantial evidence, even where the conclusion of

the ALJ may be justified based upon the record." *Cole, supra*, citing *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir.2009) (citations omitted).  The Court cannot reverse the decision of an ALJ, even if substantial evidence exists in the record that would have supported an opposite conclusion, so long as substantial evidence supports the ALJ's conclusion.  *Walters v. Comm'r of Soc. Sec.,* 127 F.3d 525, 528 (6th Cir.1997).

## V.      ANALYSIS

### A.      Medical evidence

Prior to sustaining the injury that precipitated Plaintiff's disability applications, she sought treatment for several injuries, including neck and shoulder pain resulting from a fall from a trampoline (she landed on her head) in 1999, a fractured right clavicle she sustained when she fell from a mini-bike (she landed on her shoulder) in 2004, two subsequent  re-fractures of the right clavicle, as well as anxiety, nasal polyps, seasonal allergies, irritable bowel syndrome, and high blood pressure. Tr. at 287, 368, 855, 863.

Shortly before sustaining the injury that precipitated Plaintiff's disability applications, at an appointment on March 24, 2010 with Brenda S. Buis, D.O., Plaintiff's primary care physician, Plaintiff complained of bilateral pain in her legs, with more severe pain in her left leg, which began a month prior to the appointment.  She reported that it felt like "blood squishing through her leg." Tr. at 867.  Plaintiff returned to Dr. Buis' office on April 6, 2010 for an evaluation of doppler studies performed on March 25, 2010.  Tr. at 865.  Plaintiff reported no alleviation of her pain, but the treatment notes do not include any analysis of the doppler studies.  Dr. Buis instructed Plaintiff to return in one week.

On April 15, 2010, Plaintiff slipped on "a bunch of plastic zip-ties" that had been left on the floor at work and injured her back.  Tr. at  347-348, 365. At an appointment on April 20, 2010 (the alleged onset date) with Dr. Buis, Plaintiff complained of back pain in her right upper and right lower back and requested an MRI. Tr. at  863-864.

On April 21, 2010, Plaintiff visited Bina Mehta, M.D. her established pain management provider from prior injuries, Tr. at 728-755, 1027-1096, 1119-20, and reported chronic stabbing neck pain radiating into her skull and shoulders, weakness in her legs, numbness in her toes, aching

-4-

in her scapular area, and tightness and spasms in her neck. Tr. at 1149. Plaintiff had no difficulties in motor strength, gait, reflexes, or sensation, but Dr. Mehta noted numerous trigger points, a restricted range of head and neck motion, and tenderness in the thoracic/rib area. Tr. at 1150-1152. Dr. Mehta diagnosed neck and thoracic spine sprain and strain. Tr. at 1152. He provided a note that Plaintiff could not work until April 30, 2010 and prescribed pain medication. Tr. at 1152.

Dr. Buis' treatment notes from April 28, 2010 indicate that Plaintiff was there to review a nerve conduction study performed on April 13, 2010.  Tr. at 840. Plaintiff described herself as "achy." Tr. at 840.  However, no analysis of the nerve conduction study is included in Dr. Buis' treatment notes.  Likewise, at an appointment on May 3, 2010, Plaintiff sought an evaluation and review of an MRI.  Tr. at 836.  No analysis appears in the treatment notes.  Plaintiff returned to Dr. Buis on May 10, 2010 and she continued to report bilateral leg pain, with no improvement from prior therapies.  Tr. at 834. Again, under the heading "Chief Complaint," Dr. Buis writes, "Pt states here to evaluate lab results done on 5-10-10," however no analysis appears in the treatment notes. Tr. at 833.

On June 1, 2010, Dr. Mehta wrote a second note that Plaintiff could not work until July 6, 2010. Tr. at 296.  On June 7, 2010, Plaintiff visited Michael Pryce, M.D., a workers' compensation physician who treated her previous injuries to her clavicle.  Tr. at 349.  She reported neck, shoulder, and back pain. Tr. at 365-67. Dr. Pryce diagnosed lumbar and cervical spine pain with right shoulder pain and bursitis. Tr. at 367.  His examination revealed reasonable range of motion in Plaintiff's cervical spine and good range of motion in Plaintiff's lumbar spine and her extremities.  Tr. at 366.

On June 14, 2010, Dr. Pryce reviewed the results of an MRI of Plaintiff's cervical spine and noted:  (1) disc osteophyte complexes causing mild spinal stenosis and cord impingement at C4-5, C5-6, and C6-7; (2) moderate narrowing of the neural foramina at C4-5; and (3) severe narrowing of the neural foramina at C5-6 and C6-7.  Tr. at 345-346, 374-375, 765-766, 1117-1118.

On June 21, 2010, Dr. Pryce reviewed the results of an MRI of Plaintiff's lumbar spine, which revealed: (1) multi-level facet arthropathy and degenerative disc disease without spinal stenosis; (2) right extraforaminal nuclear protrusion at L3-4 causing mild displacement of the left

L3 nerve root; (4) right foraminal/extraforaminal nuclear protrusion at L4-5 contacting the left L4 nerve root; and (5) hepatomegaly. Tr. at 343, 372-73, 767-68.

Dr. Pryce opined that it was "well within the realm of reasonable medical certainty" that Plaintiff's herniated discs were caused by her work injury. Tr. at 343. Dr. Pryce's treatment notes also reveal that Plaintiff believed that her Worker's Compensation file had been altered by her employer.

At an appointment with Dr. Buis on June 25, 2010, Plaintiff requested a referral to a neurologist. Tr. at 831. Plaintiff also requested analysis of the MRI performed for Dr. Pryce, which is not included in the treatment notes. The treatment notes reveal that the appointment was twenty-five minutes in length and included "counseling regarding coping mechanisms [and] smoking cessation program." Tr. at 832.

On July 13, 2010, Plaintiff visited Hugh J. Miller, M.D., a neurologist, complaining of bilateral leg pain for the last three years. Tr. at 378-381. She denied any weakness in her legs, and also denied any back or neck pain, other than "mild aches" since her fall in April of 2010. Tr. at 378. Plaintiff disclosed smoking, drinking alcohol, and "weightlifting daily." Tr. at 379. Dr. Miller diagnosed probable small fiber peripheral neuropathy possibly related to alcohol use. Tr. at 380. Dr. Miller instructed Plaintiff to stop smoking and drinking alcohol. Tr. at 380-381. Plaintiff agreed to stop drinking prior to starting any medication. Tr. at 381. Dr. Miller reviewed Plaintiffs' June 9, 2010 MRIs and noted no compression of the spinal cord and no intrinsic lesions of the cord at the cervical spine, and no compression or stenosis, but mild degenerative changes, at the lumbar spine. Tr. at 380.

Plaintiff underwent treatment for her cervical and lumbar pain in August, September, and October of 2010. She received multiple cervical and lumbar epidural steroid injections. Tr. at 769-773, 787, 790, 798, 800, 807.

On November 23, 2010, Plaintiff reported to Dr. Buis that pain medication provided moderate improvement in her symptoms, but that she continued to suffer severe back pain. Tr. at 825-26. Plaintiff returned to Dr. Pryce on December 1, 2010, when he noted "a lot of problems with her neck and radicular pain in both upper and lower extremities," as well as depression. Tr. at 974.

-6-

Dr. Pryce considered Plaintiff "heading towards a full and complete disability."Tr. at 974. Four weeks later, on December 29, 2010, Dr. Pryce noted large masses on each of her elbows and on her thighs, but Plaintiff explained that Dr. Buis had conducted "all kinds of appropriate lab tests" with normal results. Tr. at 973. Following an examination, Dr. Pryce suspected possible blood dyscrasia. Tr. at 973.

An MRI of Plaintiff's thoracic spine performed on November 29, 2010 was grossly similar in appearance to a prior study from August of 2009. Tr. at 987.

Plaintiff returned to Dr. Mehta regularly through 2011. Tr. at 983-986, 1140, 1144, 1017-1026, 1175-1187. On March 4, 2011, Dr. Mehta completed a "Residual Functional Capacity Questionnaire" on Plaintiff's behalf in which he concluded that Plaintiff is disabled within the meaning of the Act. Tr. at 945. Specifically, Dr. Mehta opined that Plaintiff could occasionally lift and carry up to ten pounds; sit for four hours, stand for two hours, walk for two hours, and work a total of four hours in an eight-hour day; never bend, squat, or crawl; occasionally climb, reach, stoop, crouch, and kneel; occasionally tolerate exposure to unprotected heights, moving machinery, temperature changes, and environmental irritants such as dust, fumes, and gases; and frequently drive auto equipment; but would be absent from work more than three times a month. Tr. at 946-947.

On April 20, 2011, Dr. Pryce noted that Plaintiff had trouble moving due to stiff joints and was depressed. Tr. at 972. He wrote that "with all of the depression, all of the somatic complaints that this woman has that she certainly qualifies for 100% disability under SSI." Tr. at 972. Dr. Pryce continued to opine that Plaintiff needed disability through August of 2011. Tr. at 1190.

On June 13, 2011, Plaintiff visited Jeffrey S. Tharp, D.O., a orthopedic spine surgeon, for a consultation. Tr. at 1170-71. She reported longstanding diffuse non-dermatomal cervical and lumbar pain and aches in her legs. Tr. at 1170. On examination, Dr. Tharp noted a normal stance and gait, good strength with heel and toe ambulation, a limited range of back motion, diminished reflexes, intact sensation, full strength, and a negative straight leg-raising test. Tr. at 1170-171.

Dr. Tharp diagnosed cervical, thoracic, and lumbar degenerative disc disease, spondylosis with axial pain, and probable disc and facet arthropathy causing some stenosis of the lower

extremities. Tr. at 1171. Dr. Tharp recommended continued conservative care, including epidural steroid injections. Tr. at 1171. In the event that epidural injections did not successfully diminish her pain, Dr. Tharp suggested another MRI and EMG. He wrote, "If that shows discopathology that is compressive correlate and EMG/NCT and then I will gladly see her in re- surgical evaluation." Tr. at 1171.

In June of 2011, Dr. Mehta treatment notes document tenderness and restricted range of motion in the spine, and Plaintiff had joint swelling and pain, along with muscle cramps and weakness. Tr. at 1181-1182, 1185. On August 10, 2011, Dr. Pryce stated that she looks terrible when she stands, that "she tucks her pelvis up underneath her because of the pain" and his conclusion after an examination was that "she really is not progressing well." Tr. at 1190. On August 15, 2011 Dr. Mehta again found her to have tenderness and restricted range of motion in the spine. Tr. at 1177. Dr. Pryce's examination on September 19, 2011 noted a "terrible paravertebral spasm in her neck and back," and that she still has trouble with the shoulder. Tr. at 1189.

On August 15, 2011, Dr. Mehta noted a slow, intact gait, mildly restricted cervical and lumbar ranges of motion, full strength, normal reflexes, and a negative straight leg-raising test. Tr. at 1177. Plaintiff reported being satisfied with her treatment and that her medication "takes the edge off the pain and allows her to perform her ADL's." Tr. at 1175. Dr. Mehta transferred Plaintiff to another pain management provider since he "had nothing further to offer." Tr. at 1178.

Plaintiff visited James Bressi, D.O., at Summit Pain Specialists on October 4, 2011. Tr. at 1192- 1195. An examination of her spine and extremities found her to be positive for pain, tenderness, muscle spasms, limited range of motion, and radicular pain in different areas. Tr. at 1193. She was diagnosed with a variety of conditions involving the spinal region, including cervical and lumbar radiculitis. Tr. at 1195.

Plaintiff returned to Dr. Buis for treatment of back pain and depression through February 2012. Tr. at 1200-1215, 1229-1235. Examinations established muscle tenderness with limited range of motion. Tr. at 1202, 1209, 1213. Plaintiff was diagnosed with chronic pain syndrome. Tr. at 1202, 1206, 1209, 1213. On May 15, 2012, Dr. Buis completed a "Residual Functional Capacity Form - Physical," indicating that Plaintiff was essentially disabled within the meaning of the Act.

Tr. at 1241. Specifically, Dr. Buis opined that Plaintiff could sit, stand, and walk for one hour; required a sit/stand option; could frequently lift up to ten pounds; never squat, reach below the waist, push, pull, or use her feet for foot controls; occasionally bend, crawl, climb, and reach above or at waist level; never be exposed to unprotected heights, moving machinery, temperature extremes, or environmental irritants; drive automotive equipment on a moderate basis; and would be absent from work three or more days each month. Tr. at 1241.

### B.    State Agency Assessments

On December 22, 2010, W. Jerry McCloud, M.D., a state agency physician, reviewed the medical evidence of record and opined that Plaintiff could perform light exertional work.  Tr. at 80-81, 92-93. On May 31, 2011, Gary Hinzman, M.D., a second state agency physician, reviewed the medical evidence of record and concurred that Plaintiff could perform a full range of light exertional work. Tr. at 111-112, 128-129.

### C.    Hearing testimony

Plaintiff attended high school through the eleventh grade and does not have a high school diploma.  Tr. at 220.  She testified that her injury in 2010 "really ruined the rest of [her] back." Tr. at 47.  She was already having problems with part of her upper back at the time, and the fall affected her lower back and the rest of her upper back. At the time of the hearing, she was prescribed Vicodin, 1000 mg., five times a day.  Tr. at 47-48.  She testified that she is also prescribed an antidepressant, an anti-anxiety medication, Atelvia for the treatment of osteopenia, and Valtrex.  Tr. at 48.

At the time of the hearing, Plaintiff's residence was in foreclosure. She lived there with her twenty-six year old son.  Plaintiff drove "a couple miles around the house," including trips to the grocery store, which was near her home.  Plaintiff testified that both of her sons and her neighbor helped her around the house.

Plaintiff further testified that she no longer drank alcohol because she takes so much prescription medication.  However, later in her testimony, Plaintiff stated that she limits her alcohol consumption to the weekends, and she does not believe that it affects her depression. She explained

that her statement in the treatment notes that she was lifting weights daily was actually a reference to the weight of the material she lifted at work. Tr. at 49.

Plaintiff identified Dr. Miller as a "company doctor" and accused him of falsifying records on behalf of her employer.  Tr. at 51.  She testified that she was not drinking heavily at that time, and recalled that Dr. Miller, who was not a company doctor, but, instead, the neurologist to whom Plaintiff was referred by Dr. Buis at Plaintiff's request, was rude to her.  Tr. at 52.  When asked how much alcohol she was drinking in the summer of 2010, she responded "hardly none" because "[her] whole body was shaking inside."  Tr. at 52.  Plaintiff conceded that she may have been drinking alcohol up to five times a day before the accident in April of 2010.  Tr. at 53.  However, Dr. Mehta's treatment records dated November 12, 2010 document a positive urine screen revealing both alcohol and marijuana use.  Tr. at 778.

Plaintiff testified that she must divide her house cleaning into two days because she cannot clean the whole house in one day. Tr. at 54.  She further testified that if she does anything physical, she must rest for the following two days.  She rarely prepares meals. Tr. at 59.  Her son assists her with household chores.  Tr. at 63.  She is capable of performing two to four hours of housework, but she must lay down afterward, and she experiences pain the following couple of days.

She experiences pain in both of her legs, her hips, her lower back, her upper back, and in her shoulders and shoulder blades.  Tr. at 54. She can stand for thirty minutes then her legs start shaking. Tr. at 55. Plaintiff shops for groceries, but not often, and she relies on the shopping cart for support. Plaintiff  believes that she can walk across the street to her neighbor's backyard.

She has had a few falls.  Tr. at 56. Plaintiff treats her back pain with heat and ice.  She sees a chiropractor and gets epidural injections every six months.  Plaintiff believes that, without treatment, she could not walk. Tr. at 57.

Plaintiff also experiences neck pain that limits the range of motion in her neck.  She testified that she owns a laptop computer, and that she can use it for up to one hour, then she must get up or lay down.  She also experiences numbness in her arms, which occurs when she reaches above her head.  Tr. at 59.  She testified that she can lift a maximum of ten pounds.

Plaintiff further testified that she is depressed because she has lost everything.  Tr. at 59.  She suffers from anxiety and is angry with her employer for "putting [her] in the streets" after her years of service.  Plaintiff has "bad days" every couple of weeks when she does not want to get dressed.  Tr. at 60.   However, she testified that she is improving with treatment. She has difficulty concentrating, but that problem is also improving with treatment.  Tr. at 62.

### D.    The ALJ's Decision

The ALJ gave little weight to the opinion of Dr. Pryce.  Specifically, the ALJ wrote:

> [Dr. Pryce], who had treated [Plaintiff's] right clavicle fracture and rendered a worker's compensation opinion regarding the mechanism of injury to [Plaintiff's] neck/back but who had not, according to the record, rendered any significant treatment to [Plaintiff] since well before her onset date, wrote on December 1, 2010 – without any accompanying clinical or other findings – that [Plaintiff] was really in a lot of trouble" due to "a lot of problems with her neck and radicular pain in both upper and lower extremities.  Although not recorded elsewhere in the record, Dr. Pryce further wrote that [Plaintiff] was going to have to face some type of back surgery in the future" and that she was "heading towards full and complete disability" because she was then "unable to do much for herself in the way of gainful employment and the depression is really debilitating her and keeping her from proceeding with a normal life.  because their conclusions lack any record support, either in the notes of Dr. Pryce or any other source, I accord these ruminations of Dr. Pryce little weight in the determination of this matter.
>
> Dr. Pryce himself acknowledged, on December 29th, that [Plaintiff's] "family doctor ordered all kinds of appropriate tests" regarding [Plaintiff's] complaints, an that "for the most part a lot of them have come back normal"; apart from those regarding [Plaintiff's] spine, virtually all of [Plaintiff's] diagnostic and laboratory studies have come back normal, including those assessments studying [Plaintiff's] asserted complaints of debilitating depression and anxiety."

Tr. at 26-27.

The ALJ further wrote:

> On August 10, 2011 after not seeing [Plaintiff] "for quite some time now", Dr. Pryce "did a little physical exam" on [Plaintiff] and without recording any finding apart from an observation that [Plaintiff] "tucks her pelvis up underneath her because of the pain in her back" – again unrecorded elsewhere – wrote that "this woman needs to be on some form of disability" Again, and for reasons previously cited, this opinion is accorded little weight.
>
> Such conclusion is supported by the August 15, 2011 treatment note of Dr. Mehta. [Plaintiff] saw Dr. Mehta in routine follow-up on said date, reporting cervical, thoracic , and lumbar pain, cramping in her legs, and stress "due to mot working and her house is now in foreclosure; [Plaintiff] indicated, however, that her medication "takes the edge off the pain and allows her to maintain her ADLs" and [Plaintiff] stated that she was "overall satisfied with her pain management."

Tr. at 29.

-11-

The ALJ also gave little weight to the opinion of Dr. Buis.  The ALJ wrote:

On May 15, 2012, [Dr. Buis] complete a residual functional capacity assessment similarly both internally and externally in relation to not only her own treatment records but the remaining medical evidence in the record. On said date, Dr. Bruis [sic] advised that [Plaintiff] could sit, stand, and walk, respectively for 1 hour – she did not indicate whether this 1 hour was the "total" capacity of [Plaintiff] during ordinary workday [sic] or a "continuous" ability of [Plaintiff]; Dr .Buis also advised that [Plaintiff] could drive automotive equipment with only moderate limitation but that [Plaintiff] could not use her feet fo the operation of foot controls.  I find these limitations inconsistent with each other , reducing the probative value of Dr. Bruis' [sic] opinion.  Moreover, I find from Dr. Bruis' [sic] treatment records that [Plaintiff] is not as limited as opined; thus, this opinion is similarly accorded little weight.

Tr. at 30.

With respect to Dr. Mehta, the ALJ observed:

Dr. Mehta's March 2011 residual functional capacity assessment is similarly both internally and externally inconsistent.  Dr. Mehta opines that [Plaintiff] can sit for 4 hours, and stand and walk for two hours each, for a total of 8 hours of activity per day, but that [Plaintiff] can work for no more than 4 hours per day, and that, further, [Plaintiff's] severe pain would cause her to miss more than 3 days of work per month.  Dr. Mehta advises that these conclusions are objectively supported by diagnostic studies and clinical findings of "muscle spasm."

Dr. Mehta wrote in her notes of April 25, 2011, however that she was going to "keep [Plaintiff] off work for 6 months", although her clinical findings on said date were limited to "generalized moderate tenderness over the neck and shoulder girdle . . . moderate generalized tenderness in the lumbar area [with] movement mildly restricted in all directions"; [Plaintiff's] muscle strength and tone were deemed normal, and [Plaintiff's] gait remained "intact." straight leg testing was negative. Moreover, and as noted above, in August 2011, [Plaintiff] reported to Dr. Mehta that he medication "takes the edge off the pain and allows her to maintain her ADLs", and that [Plaintiff] also then stated that she was "overall satisfied with her pain management" . . . [Plaintiff] cervical and lumbar ranges of motion were only "mildly restricted in all directions," while her extremities still retained full strengths, ranges of motion, and sensory and reflex responses.  Straight leg testing was still negative, and Dr. Mehta determined that [Plaintiff] would be referred to another pain management facility, as "[Dr. Mehta's pain management clinic had' nothing further to offer."

These findings are inconsistent with keeping [Plaintiff] "off work" and are inconsistent with limiting [Plaintiff] to no more than four hours of work, particularly in light of [Plaintiff's] opined abilities to sit, stand, and walk for a duration of an 8-hour workday.  For these reasons, Dr. Mehta's opinion is afforded very limited weight.

Tr. at 31

The ALJ, instead, credited the opinions of the agency physicians because they were consistent with the manifest evidence in the record. Tr. at 31.  The ALJ wrote, "While the medical evidence  establishes that [Plaintiff] has documented degenerative spinal impairments, with some

-12-

evidence of radiculopathy, the medical evidence does not support the magnitude of pain and dysfunction asserted by [Plaintiff.] According these agency opinions significant weight, therefore, I find that [Plaintiff] has the residual capacity for light work set forth above." Tr. at 31.

### E.    Treating Physician Rule

Plaintiff advances a single argument in this appeal. Plaintiff contends that the ALJ erred in assigning little weight to the opinions of two treating physicians, Dr. Buis and Dr. Mehta, both of whom opined that she is unable to lift more than ten pounds. Plaintiff reasons that, based upon these conclusions, she is only capable of sedentary[3] work, and that, based upon her age and limited education, she is disabled according to the Grids. Because the appeal challenges the ALJ's conclusions regarding Plaintiff's physical limitations, this Memorandum Opinion and Order focuses on that portion of the record that pertains to Plaintiff's physical problems.

An ALJ must adhere to certain standards when reviewing medical evidence in support of a claim for social security. Most importantly, the ALJ must generally give greater deference to the opinions of the claimant's treating physicians than to those of non-treating physicians. SSR 96-2p, 1996 WL 374188 (July 2, 1996); *Wilson*, 378 F.3d at 544. A presumption exists that the opinion of a treating physician is entitled to great deference. *Id.*; *Rogers, supra*, at 243 (6th Cir. 2007). If that presumption is not rebutted, the ALJ must afford controlling weight to the opinion of the treating physician if that opinion regarding the nature and severity of a claimant's conditions is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the] case record." *Wilson,* 378 F.3d at 544.

When an ALJ determines that a treating physician's opinion is not entitled to controlling weight, he must consider the following factors in determining the weight to give to that opinion: the length, frequency, nature, and extent of the treatment relationship; the supportability and

---

[3]At page 24 of the decision, the ALJ writes, "In finding that Claimant has the residual functional capacity to perform *sedentary* work. . ." Tr. at 24 (Emphasis added.) This reference to sedentary work appears to be a typographical error, insofar as the ALJ concludes on page 23 that Plaintiff is capable of performing a limited range of light work.

consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors. *Id.*

If an ALJ decides to discount or reject a treating physician's opinion, he must provide "good reasons" for doing so. SSR 96-2p. The ALJ must provide reasons that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Id.* This allows a claimant to understand how his case is determined, especially when he knows that his treating physician has deemed him disabled and he may therefore " 'be bewildered when told by an administrative bureaucracy that he is not, unless some reason for the agency's decision is supplied.' " *Wilson v. Commisioner of Social Security,* 378 F.3d 541, 544 (6th Cir.2004) quoting *Snell v. Apfel*, 177 F.3d 128, 134 (2d Cir.1999). Further, it "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* If an ALJ fails to explain why he rejected or discounted the opinions and how those reasons affected the weight accorded the opinions, this Court must find that substantial evidence is lacking, "even where the conclusion of the ALJ may be justified based upon the record." *Rogers v. Commisioner of Social Security,* 486 F.3d 234, 243 (6th Cir.2007), citing *Wilson*, 378 F.3d at 544.

On the other hand, "opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' " *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. *Id.* citing 20 C.F.R. §404.1527(c). Other factors "which tend to support or contradict the opinion" may be considered in assessing any type of medical opinion. *Id.* citing §404.1527(c)(6).

In *Gayheart*, the Sixth Circuit recognized that conflicting substantial evidence must consist of "more than the medical opinions of the nontreating and nonexamining doctors." The Sixth Circuit reasoned that "[o]therwise the treating-physician rule would have no practical force because the treating source's opinion would have controlling weight only when the other sources agreed with that opinion." *Gayheart* at 377. However, "[t]he determination of disability is [ultimately] the

prerogative of the [Commissioner], not the treating physician." *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004) quoting  *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir.1985).

Here, the ALJ clearly articulated his reasons for rejecting the opinions of Drs. Pryce, Buis, and Mehta.  First, the ALJ opined that Dr. Pryce's conclusion that Plaintiff was completely disabled was not supported by Dr. Pryce's treatment notes, which did not include sufficient examination or analysis by Dr. Pryce. Moreover, the ALJ cited the fact that Dr. Pryce's treatment notes were often directly at odds with his conclusion insofar as he frequently recorded normal findings with respect to Plaintiff's spinal problems.  Dr. Buis' treatment notes contained several references to various diagnostic tests, but her treatment notes did not include any analysis of those tests. The ALJ further observed that Dr. Buis' conclusions were at odds with one another, particularly with respect to Plaintiff's ability to sit, stand, walk, and drive. Similarly, Dr. Mehta's treatment notes failed to support Dr. Mehta's dire conclusions regarding Plaintiff's ability to perform full-time work.  Dr. Mehta opined that Plaintiff was able to sit for four hours, and stand and walk for two hours, but, nonetheless concluded that Plaintiff could only work four hours per day.  Due to the fact that the opinions of Plaintiff's physicians regarding her ability to work were internally inconsistent, as well as inconsistent with other substantial evidence in the record, the ALJ did not err in giving little weight  to those opinions, including Dr.  Mehta's opinion that Plaintiff could only lift ten pounds occasionally. Instead, the ALJ credited the opinions of the agency physicians, which he found were supported by substantial evidence in the record.  State agency physicians are "highly qualified . . .experts in Social  Security disability evaluation."  20 C.F.R. § 404.1527(f)(2)(i), 416.927(f)(2)(i).

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's decision is AFFIRMED and Plaintiff's complaint is DISMISSED with prejudice.

DATE: March 12, 2013

    */s/George J. Limbert*
    GEORGE J. LIMBERT
    UNITED STATES MAGISTRATE JUDGE

-15-